COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-334-CV

 

 

IN THE INTEREST OF B.F., 

M.F., AND Z.F.                                                                                    

 

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Introduction








Appellant Felicia C. appeals
the trial court=s order terminating
her parental rights to her three children, B.F., M.F., and Z.F.  In three issues, appellant moves to strike
the trial court=s findings
of fact and conclusions of law, argues that sections 263.405(b) and (i) of the
Texas Family Code are unconstitutional, and contends that the evidence was
factually insufficient to support the trial court=s best interest findings. 
Because we hold that the evidence was factually sufficient to support
the trial court=s best
interest findings, we affirm.

Background Facts

On October 20, 2006, the
Texas Department of Family and Protective Services (TDFPS) received a referral
that B.F. and M.F. were seen at school after hours using the bathroom and were
unsupervised outside late at night.  On
October 31, TDFPS visited appellant=s duplex on Austin Street, where she lived with her sister and their
nine children.[2]  The duplex had one living room, one
nonfunctioning bathroom, and two bedrooms. 
TDFPS investigated, and appellant and her sister admitted to using
methamphetamines.  TDFPS removed
appellant=s children,
nine-year-old B.F., six-year-old M.F., and four-year-old Z.F. and placed them
in foster care.[3]  Vickie Wright, a family-based safety services
worker at TDFPS, testified at trial that TDFPS=s concerns were appellant=s drug use and neglectful supervision. 













Tyra LaGarde, a caseworker
for TDFPS, met with appellant in November 2006. 
Appellant admitted to LaGarde that she used methamphetamines while she
was caregiver to her children.  Appellant
also told LaGarde that she had a problem and wanted to do what was needed to
get her children back.  LaGarde sent
appellant for a drug assessment, and LaGarde prepared a service and treatment
plan, which included parenting classes, a psychological evaluation, individual
counseling, domestic violence counseling, and anger management; the service
plan also required appellant to secure appropriate housing.  A drug counselor recommended that appellant
enter a two-year drug treatment program, but appellant refused.  Appellant also refused to participate in a
ninety-day drug treatment program but did agree to a thirty-day drug treatment
program that included a housing program; appellant entered rehab in February
2007.  Before entering the treatment
program in February, appellant refused to participate in UAs requested by TDFPS
in December 2006 and January 2007; appellant told LaGarde that the UAs would be
dirty.  After appellant completed the
initial thirty-day program, TDFPS offered to let appellant stay in the housing
program, but appellant refused because she wanted access to a telephone.  Appellant attended five sessions of an after-care
program, but she did not participate after April 2007.  Appellant also attended five anger management
classes, but did not complete the program. 
Appellant did not attend any domestic violence classes or individual
counseling. 

Appellant continued to be
randomly drug-tested once a month after leaving rehab.  In March 2007, appellant=s UA was negative, but an oral swab taken could not be used for
testing because the sample of saliva was not large enough.  In April 2007, appellant failed to take her drug
test, thus TDFPS listed in its records that appellant had admitted to drug use.


Also in April, appellant
moved to Wise County to live with her mother. 
While living in Wise County, appellant worked as a correctional officer
for a company called Corrections Corporation of America (CCA), although she was
unemployed at the time of trial.  TDFPS
also set up appellant=s services
in Wise County, including a psychological evaluation with Dr. Evan Knapp, a
clinical psychologist.








In May 2007, Dr. Knapp
conducted a psychological examination of appellant.  According to Dr. Knapp, appellant had a past
history of drug use; she smoked marijuana after her youngest child, Z.F., was
born and started using methamphetamines when she moved in with her sister in
2006.  Dr. Knapp also testified that
appellant=s parents
smoked marijuana all of her life.  Dr.
Knapp testified that he believed appellant had a clear drug use problem
although she did not have a long history of drug use.  He also reported that appellant had an
adjustment disorder with mixed emotional features.  Dr. Knapp stated that long-term support was
very important for appellant to be a successful parent. 

In May 2007, police arrested
appellant for traffic violations, and she spent three days in jail.  Also in May, appellant=s hair follicle drug test was void because she had recently dyed her
hair.  Appellant=s drug tests in June and July 2007 were negative; she did not submit
to drug tests in August or September 2007, so TDFPS also recorded the skipped
tests as admissions of drug use.  








At some point in August,
appellant moved back to Fort Worth and attended parenting classes.  Appellant did not often attend visitations
with her children after they were initially removed in October, but began to
visit more frequently in the summer months. 
After appellant began her job training, the visits decreased again and
remained sporadic at the time of trial. 
The children had a hard time not seeing appellant, and they were sad and
cried when she did not attend.  But the children
were happy to see each other because they lived in separate foster homes.  LaGarde testified that when appellant did
visit, there was minimal interaction. 
Appellant would often sit on a chair or the couch and only communicate
with the children when they approached her. 
CASA advocate Melissa Dailey, who was assigned to the case in November
2006, attended and observed most visits. 
She testified that appellant exhibited more interaction with her
youngest child, Z.F., and favored him more than the older two children.  She also testified that interaction with the
oldest child, B.F., was strained but improved over time.  She also testified that appellant=s interaction with M.F., her middle child, was minimal.  Dailey noticed that appellant would not
approach or hug M.F., and many times there was no interaction past the initial
hello.  Both LaGarde and Dailey often
observed appellant making phone calls during her visits.  LaGarde testified that during one visit, appellant
called the children=s father and
had the children talk to him on the phone; B.F. became very upset after talking
to her father.

When the children came into
foster care, they were not in good physical condition.  All of the children needed extensive dental
work.  For example, M.F. had numerous
cavities, and Z.F. needed seventeen crowns. 
Additionally, the children=s shots were not up to date. 
Z.F. was not in school because he did not have the required
immunizations.  TDFPS also had major
concerns about Z.F.=s
weight.  When TDFPS removed Z.F., he was
four years old but only weighed thirty pounds. 
Dailey also testified that Z.F. was very thin; his facial features were
sunken, and his eyes were dark underneath. 









The termination bench trial
took place on September 11-13, 2007.  At
trial, Jeanette Mendez, M.F.=s teacher, testified that M.F. was in her class in October 2006 for a
total of twenty-eight days.[4]  She testified that M.F. was tardy eleven out
of those twenty-eight days; he was also absent two days out of
twenty-eight.  Mendez also testified that
M.F. was very behind in his reading; for example, he should have been reading
ninety words per minute, but he read only twenty-five or thirty.  M.F. also struggled with math and had trouble
with simple addition and subtraction problems. 
Mendez testified that each student kept a journal, but M.F. would only
write one sentence in his book per day. 
Additionally, M.F. returned his homework only three times.  Mendez knew that M.F. lived right across the
street from the school, and she found out that M.F. was sneaking back into the
school building after hours to use the restroom because the toilet in his house
did not work.  Mendez also testified that
M.F. did not always meet the dress code requirement and sometimes wore his
sister=s clothes, which were too big for him. 
Mendez believed that M.F. was being neglected, but she did not know if
there was any abuse going on.  








B.F.=s foster parent, Janice F., also testified at trial.  Janice testified that B.F. had been living
with her since February 2007.  She
testified that B.F. was in fifth grade and doing well, although B.F. was Alow@ in math
when she first came to live with Janice. 
Janice also testified that B.F. told her that she had seen appellant,
her father Michael, and her aunt do drugs. 
B.F. told Janice that on visits, B.F. could smell drugs on appellant.  B.F. also told Janice that she saw appellant
and her father having sex and appellant having sex with other men. 

Additionally, Janice
testified about possible abuse to B.F. 
Janice said that she and B.F. were at home watching a documentary on TV about
children being abused by family members when B.F. began to talk about sleeping
in her father=s bed.  Janice stated that B.F. slept in her father=s bed and one time she woke up and had slobber all over her nightgown;
B.F. said that her father had slobbered on her, and she had to go change her
nightgown.  B.F. told Janice that the
slobber smelled awful and was wet. 
Janice also testified that B.F. told her that she did not feel good Adown [there]@ when she
woke up.  B.F. also told Janice that
appellant was not there.  Janice could
not get B.F. to talk about the incident anymore, but Janice did tell LaGarde
and B.F.=s therapist.  Janice testified
that she believed B.F. was abused. 








In addition to Janice=s testimony about B.F.=s abuse, caseworker LaGarde also spoke with B.F. about the same
incident.  LaGarde testified that B.F.
told her that she was in bed with her father and when she woke up, there was
white, sticky spit all over her.  LaGarde
stated that B.F. told appellant, and appellant told her to stop sleeping with
her father.  LaGarde testified that B.F.
said that her father called appellant and her sluts and bitches and stated that
B.F. was not his child. 

LaGarde testified that at the
time of trial, the children were current with their immunizations, doing great,
and responded well to a more stable, structured environment.  Five-year-old Z.F. was in kindergarten and
loved school.  He had gained weight and
took a supplement to help with more weight gain although he remained tiny for
his age.  M.F. was an exceptional child
with no need for special education and was over-the-top with academics.  Although he had anxiety and worry over the
foster care situation, he exhibited superior intelligence.  M.F. took medications for ADHD, allergies,
bed-wetting, and depression.  B.F. also
enjoyed school.  Additionally, LaGarde
testified that a home study was done on the children=s maternal grandmother, but placement was denied by TDFPS because of
unfavorable references.  TDFPS determined
that no other relatives were suitable placement options.  LaGarde testified that she believed it was in
the children=s best
interests to terminate appellant=s parental rights to the children. 








Appellant also testified at
trial.[5]  Appellant stated that she did not know her
current address because she had only lived there about one month but that her
landlord=s name was Rhonda.  Appellant
also did not know about schools in the area, and she had not checked on
teachers, schedules, or  enrollment for
her children.  Appellant testified that
she had previously worked at a correctional facility for five months from the
end of April until August, but she was not currently working because she had
recently moved back to Fort Worth to find housing for her children.  Although she did not have a job at the time
of trial, appellant testified that she had applied for employment at the post
office, Smith Security, and Racetrac.  

Appellant admitted that she
began using drugs at age twenty-one[6]
after her youngest child was born but did not know the effects that the drugs
would have.  She testified that she would
use drugs at night when the children were in bed.  Appellant testified that she was drug tested
when asked and that there was only one time that she did not go, but she still
went and was tested the next day. 
Appellant also testified that she was not using drugs anymore.  








Appellant stated that she
took her children to the dentist, but that at times, she did not have
transportation.  She also took them to
get their shots. Appellant did not talk to M.F.=s teacher and never received any notes from the school.  She also testified that Mendez=s testimony about M.F. being tardy eleven times was inaccurate; she
said sometimes they were late but not eleven times.  Transportation problems also prevented
appellant from attending individual counseling, anger management, and domestic
violence counseling; however, appellant got her car fixed the day before
trial.  Appellant stated that she was
scared of taking the bus.  Appellant
testified that she did not know services were set up for her in Wise County
while she was living there. 

Appellant met the children=s father, Michael, at a hotel once during the pendency of her
case.  She testified that he was both
mentally and physically abusive.  She
also testified that she believed he was an appropriate person to parent their
children.








Appellant testified that she
missed some visits with her children while she was in rehab, but she did not
recall missing any visits after that. 
She also missed some visits while she was training to be a correctional
officer, but she tried to leave messages with LaGarde.  Appellant also stated that she did not
remember a time when she did not express affection or hug M.F.; her
relationship with M.F. was not strained. 
She testified that she wanted her children back because she loved them
and they needed her; she was capable of parenting them, and she had a place for
them to live.  Appellant also stated that
she would seek assistance if needed. 

Rhonda E., who allowed
appellant to stay with her for three days a week before trial, also
testified.  She testified that she met
appellant four years ago at her sister=s health club.  Rhonda did not
have much contact with appellant other than an occasional phone call but
allowed appellant to stay with her because she knew appellant was trying to get
her children back.  Rhonda heard much of
the testimony at trial and testified that she felt like appellant had lied to
her, had no knowledge of all that was going on, was very naive about the
situation, and was taken off-guard by the whole thing.  Rhonda also testified that appellant never
lived with her but only stayed with her for three days; after learning the
circumstances of appellant=s situation, Rhonda testified that there was no way appellant could
live with her. 








After the three-day bench
trial, the trial court terminated appellant=s parental rights to her children, finding by clear and convincing
evidence that she (1) knowingly placed or knowingly allowed the children to
remain in conditions or surroundings which endangered their physical and emotional
well-being, (2) engaged in conduct or knowingly placed the children with
persons who engaged in conduct which endangered their physical or emotional
well-being, and that (3) termination was in the children=s best interests.  See Tex. Fam. Code Ann. ' 161.001(1)(D), (E) & (2) (Vernon Supp. 2007).  Appellant filed a motion for new trial, which
contained her statement of points, and a notice of appeal.  The trial court held a hearing on the motion
for new trial on October 9, 2007.  At
that hearing, the trial court found appellant indigent and denied the motion
for new trial. 

                                       Statement of Points

In appellant=s second issue, which we will address first, she argues that sections
263.405(b) and (i) of the family code place the first level of appeal in the
trial court, which has no appellate jurisdiction, thus preventing this court
from addressing issues preserved or otherwise raised on appeal.  Additionally, appellant argues that those
provisions violate due process and the separation of powers doctrine. 

Because this court has held
that section 263.405(i) is Avoid as a violation of the separation of powers provision of the Texas
constitution,@ we sustain
appellant=s first
issue to the extent she argues section 263.405(i) violates the separation of
powers provision of the Texas constitution. 
In re D.W., No. 02-06-00191-CV, 2008 WL 467328, at *12 (Tex. App.CFort Worth Feb. 19, 2008, no pet. h.) (en banc).

 








Findings of Fact and
Conclusions of Law

In her first issue, appellant
moves to strike the trial court=s findings of fact and conclusions of law.  Appellant contends that although neither
party requested any findings of fact or conclusions of law, the trial court
signed a document entitled AFindings of Fact and Conclusions of Law as Requested by Respondent
Felicia C[.]@ on October
9, 2007.  Appellant=s statement of points was due on September 28, 2007, fifteen days
after the termination decree was signed; therefore she did not include any
attack on the findings of fact or conclusions of law.  Appellant questions whether she has waived
her factual sufficiency complaint because she was not able to challenge the
individual findings of fact and conclusions of law in her statement of points. 

The State does not contest
appellant=s contention
and concedes that the evidentiary findings entered by the trial court are
immaterial.  Additionally, appellant did
generally raise her factual sufficiency challenge to the trial court=s best interest finding in her combined motion for new trial and
statement of points.  Furthermore, we
have already determined that section 263.405(i) of the Texas Family Code
violates the separation of powers provision of the Texas constitution.  D.W., 2008 WL 467328, at *12.  Thus, we sustain appellant=s first issue and address the merits of her remaining issue.

 








Factual Sufficiency Standard
of Review

A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003).  In a termination
case, the State seeks not just to limit parental rights but to end them
permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685 S.W.2d
18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20-21; In re E.M.N., 221 S.W.3d 815,
820 (Tex. App.CFort Worth
2007, no pet.).








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  TEX. FAM. CODE ANN. ' 161.001
(Vernon Supp. 2007); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).

Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex.
2002).  This intermediate standard falls
between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).








In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a fact-finder could reasonably form a firm conviction or
belief that termination of the parent=s parental rights would be in the best interest of the child.  In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).  If, in light of the entire
record, the disputed evidence that a reasonable fact-finder could not have
credited in favor of the finding is so significant that a fact-finder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108.

Prompt and permanent
placement of the child in a safe environment is presumed to be in the child's
best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include: 

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and








(9)    any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).  

These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

In addition to the above, a
parent=s inability to provide adequate care for  the children, lack of parenting skills, and
poor judgment may also be considered when looking at the children=s best interest.  In re
C.A.J., 122 S.W.3d 888, 893 (Tex. App.CFort Worth 2003, no pet.). 
Evidence of a parent=s unstable lifestyle can also support a factfinder=s conclusion that termination is in the children=s best interests.  In re
S.B., 207 S.W.3d 877, 887 (Tex. App.CFort Worth 2006, no pet.). 
Furthermore, a parent=s drug use and inability to comply with his or her family service plan
support a finding that termination is in the children=s best interests.  Id. at
887-88.  

 

 








Desires of the children

Caseworker LaGarde testified
that when the children were initially placed in foster care and realized that
most people did not live the way they had been living, they were sad.  The children expressed a desire to return to
living with appellant if conditions were better.  

Janice F., B.F.=s foster parent, testified that B.F. loved appellant and prayed for
her.  Janice also testified that B.F.
wanted to be with appellant but not if appellant continued to do drugs and go
out often.  B.F. did not want to be the
mother to her younger brothers.  

LaGarde testified that the
transition into adoption may be hard on the children at first, but they were
ready to move on.  She testified that
they wanted closure and were ready to go to the next phase of their lives.  She also stated that their relationship with
appellant was strained and there was minimal interaction between appellant and
the children.  CASA advocate Dailey also
testified that moving the children to a new home would initially be challenging
because they would no longer be with their cousins and because they loved
appellant, but it was critical that the children be together.  She testified that the sibling relationship
should take priority over the relationship with their cousins. 

 

 








The
emotional and physical needs of the children now and in the future, and the
emotional and physical danger to the children now and in the future

 

Family-based safety service
worker Wright testified that appellant=s duplex was clean, the kitchen worked, and there was food in the
house.  But a court report by CASA
advocate Dailey stated that the house contained no food.  The record contains evidence that M.F. and
Z.F. were too thin, they went to school hungry, and often asked neighbors for
food.  Dailey=s testimony illustrates the lack of a proper diet; she stated that
Z.F.=s facial features were sunken, and his eyes were dark underneath.  Additionally, the bathroom did not work, and
B.F. and M.F. were sneaking into their school across the street after hours to
use the restroom.  The record reflects
that the children had extensive dental problems that required numerous caps,
crowns, and fillings.  In addition, the
children=s shots were not up to date. 
Although she sometimes had transportation problems, appellant testified
that she took her children to the dentist and that the children=s shots were current. 








The evidence also shows that
appellant has had frequent changes of residences and multiple jobs.  Since the children were placed in foster care
in October 2006, appellant had lived in at least five locations: with a friend
Rhonda, with a cousin named Amber, with her mother in Wise County, at a
thirty-day drug treatment facility, and in a house off of Austin Street.  Before living on Austin Street, appellant
lived in two homes for battered women. 
Appellant testified that she had four jobs since she lived in the home
for battered women, but the evidence shows that appellant>s only job was for five months as a correctional officer.  Appellant was not employed when the children
were removed nor was she employed at the time of trial.  Further, it was not clear at trial where
appellant was living.  Appellant
testified that she was living with her friend Rhonda; however, Rhonda testified
that she let appellant stay with her for three days about a week before trial,
but appellant was not currently living with her nor could appellant live with
her. 

The evidence also shows that
the children struggled in school. 
However, since their removal, the children had done great and responded
well to a more stable, structured environment. 
Z.F. was in kindergarten, loved school, and gained weight.  M.F. was an exceptional child with no need
for special education, over-the-top with academics, and exhibited superior
intelligence.  Although he had anxiety
and worry over the foster care situation, M.F. took medications for ADHD,
allergies, bed-wetting, and depression. 
B.F. also enjoyed school and was doing well.  

 

 

 

 








The parental abilities of the individuals
seeking custody, and the programs
available to assist these individuals to promote the best interest of the
children

Appellant admitted that she
began using drugs at age twenty-one after her youngest child was born.  Although appellant testified that she did
drugs at night when her children were in bed, the evidence demonstrates that
her children were aware of her drug use. 
For example, B.F. told Janice that she saw appellant doing drugs and
that she could smell drugs on appellant during visitations.  Additionally, M.F. was seen simulating
injecting something into his arm.  

After appellant completed the
thirty-day drug treatment program, TDFPS required her to be drug tested once a
month.  Appellant testified at trial that
she was not using drugs anymore, but she had three positive test results and
six admissions from December 2006 until September 2007.  During this same time period, appellant
tested negative for drugs only three times. 








The evidence demonstrates
that appellant completed a psychological evaluation and parenting classes as
required by her service plan.  Appellant
also participated in other programs and services, such as the after-care
program and anger management; however, appellant testified that she did not
complete those programs because she started working.  Additionally, appellant did not participate
in any individual counseling or domestic violence counseling.  Although housing was an issue in this case,
appellant refused to stay in the housing program following the completion of
her thirty-day treatment program. 

Dr. Knapp conducted a
psychological evaluation of appellant in May 2007.  Dr. Knapp testified that appellant did not
have a positive relationship with the children=s father, Michael, and that he was verbally abusive.  Despite appellant admitting that Michael was
both mentally and physically abusive, she met him at a hotel once while the
case was pending and testified that she believed he was an appropriate person
to parent their children.  There is also
evidence that appellant was aware that Michael was sexually abusing B.F., but
she took no action to protect her daughter. 
When B.F. told appellant about what had happened, appellant told B.F. to
stop sleeping with her father.  

Dr. Knapp also observed that
appellant had low confidence, did not feel good about her abilities or about
herself, and had low self-esteem.  He
testified that although appellant had dropped out of high school, she later
went back to get her GED.  He also stated
that appellant had an average IQ with a high school reading level and seventh
grade math skills. 








The record also reflects that
appellant made some effort to attend visitations with her children.  Appellant missed most visits during the first
two months after the children were removed and before she entered rehab, but
she did make most of the visits after rehab until she started training for her
job as a correctional officer.  The record
also reflects that many of those visits were strained, and she had minimal
interaction with the children. 
Additionally, appellant often made phone calls during visitation hours. 

The evidence reflects that
TDFPS made efforts to work with appellant. 
For example, TDFPS set up services for appellant when she moved to Wise
County and tried to coordinate visits to accommodate appellant=s schedule.  But appellant was
unable to complete most of her service requirements or remain drug free.  Furthermore, she continued to interact with
the children=s abusive
father rather than develop a relationship with her children.

The
plans for the children by these individuals or by the agency seeking custody,
and the stability of the home or proposed placement

 

Regarding future plans for
the children, both LaGarde and Dailey testified that TDFPS=s goal was to have the children adopted together.  At the time of trial, the children were
living apart in foster homes, but Dailey testified that keeping the children
together was critical.  LaGarde testified
that a home study was done on the children=s maternal grandmother, but TDFPS denied placement because of
unfavorable references.

Appellant testified that she
was trying to obtain housing for her herself and her children, but at the time
of trial, appellant was unemployed and homeless.








The
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one, and any excuse for the acts or
omissions of appellant

 

As for the parent-child
relationship, there is evidence that B.F. took on the role of mother to her
younger brothers.  For example, appellant
would sleep all day, and B.F. would wake her to make sure M.F. was picked up
from school. In addition, the children were sad when they realized that the life
they had been living with appellant was not normal.  Furthermore, appellant did not seem to be as
bonded to the children as they were to her.

The evidence also establishes
that appellant was a chronic drug user and that she never provided money,
clothing, or gifts to her children while they were in foster care.

Based upon our review of the
entire record, including appellant=s history of drug abuse and inability to maintain a stable lifestyle
with steady employment and adequate housing, we conclude that the trial court
could have reasonably formed a firm conviction or belief that termination of
appellant=s parental
rights was in the children=s best interest.  See S.B., 207
S.W.3d at 887-88.  Therefore, we hold
that the totality of the circumstances in light of the Holley factors is
factually sufficient to establish by clear and convincing evidence that
termination was in B.F.=s, M.F.=s, and Z.F.=s best
interest.  Id.  Accordingly, we overrule appellant=s third issue.








Conclusion

Having overruled appellant=s third and only dispositive issue, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL F:    CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

 

CAYCE,
C.J. concurs without opinion.

 

DELIVERED:
April 3, 2008

 

 











[1]See Tex. R. App. P. 47.4.





[2]Michael
F., the children=s
father, did not live with appellant or the children.  At the time of trial, he was
incarcerated.  Michael=s
parental rights to the children were terminated on September 13, 2007.  He did not appeal that order.





[3]Rather
than place B.F., M.F., and Z.F. together in the same foster home, TDFPS placed
them in homes with their closely-related cousins because they had all been
living together prior to removal.  

 





[4]M.F.
would have been seven years old.





[5]Appellant
was present on the first day of trial, but she arrived almost two hours late on
the second day of trial.  Appellant
testified that she thought the trial started at 10:00 a.m. 





[6]Appellant
was twenty-seven years old at the time of trial.